## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

HAYK HARUTYUNYAN,

        Petitioner,

v.

LILIT SARGSYAN,

        Respondent.

Civil Case No.: 1:20-CV-10650-IT

## <u>RESPONDENT'S PRE-HEARING MEMORANDUM</u>

Pursuant to the Court's Order of July 22, 2020, the Respondent, Lilit Sargsyan ("Mother") submits this Pre-Hearing Memorandum for "Phase One" of the hearings scheduled to commence on August 6, 2020. Pursuant to the Court's Order, this memorandum addresses the evidence related to the following two issues: 1. whether at the time of Respondent's removal of the Child from Armenia, Petitioner "actually exercised" custody rights, including actually exercising rights related to the child's care and actually exercising a right to determine the child's place of residence, or would have exercised those rights but for the child's removal; and, 2 the Respondent's affirmative defenses.

## SUMMARY OF RESPONDENT'S PHASE ONE CASE

When the Mother traveled with the Child for a visit to Boston in December 2019, the Petitioner was not exercising rights related to the Child's custody, care or residence. After August 20, 2019, the Petitioner never had or wanted custody of the Child. The Petitioner abandoned the Mother and the Child on August 20, 2019, when he threw them out of his apartment in the middle of the night in a violent fit of rage at the Mother for not "obeying him." Thereafter, from August 21, 2019 onward, the Petitioner had little, if any, involvement with the Child. Through the fall of 2019, the Mother and the Petitioner discussed how to formally terminate their marriage. The Petitioner made it clear to the Mother that he had no interest in custody of the Child and that his sole objective was to avoid paying child support. Between August 21, 2019 and December 7, 2019, the Child lived full time with the Mother at the maternal grandmother's home and the Mother fully cared for and supported the Child. The Petitioner refused to contribute to the support the Child, while he traveled with companions and spent lavishly on himself. The Petitioner would not have exercised rights of custody, but for the Child's visit to the United States. After August 21, 2019, the Petitioner never contested the Mother's custody of the Child in Armenia, other than as a litigation tactic in May, 2020. The Petitioner is a violent, vindictive man who poses a credible risk of grave harm to the Mother and the Child. He is seeking the return of the Child and the Mother as leverage to avoid paying child support and as retribution to further punish the Mother for "disobeying him." He has threatened the Mother numerous times with serious bodily harm and even death. If the Mother and Child are returned to Armenia, the Petitioner will carry out his threat and seek violent retribution on them. The Court should deny the Petition and protect the Mother and Child from the Petitioner's violent, vindictive wrath.

## CONCISE SUMMARY OF THE PHASE ONE EVIDENCE
## OFFERED BY THE RESPONDENT:

**1. When the Mother traveled with the Child to Boston on December 7, 2019, the Petitioner was not exercising rights of the Child's custody, care or residence. The Petitioner would not have exercised those rights, but for the Child's visit to the United States with the Mother.**

### A. On August 20, 2019 the Petitioner Abandoned the Child:

On August 20, 2019, months before the Mother traveled to Boston, the Petitioner abandoned the Mother and the Child when, in a fit of rage, he ordered them out of "his apartment" in Armenia and told them to never return. The incident occurred late at night, a few days after the Petitioner, the Mother and the Child returned from a visit to the Petitioner's mother's home in France. During the visit to France, the Petitioner "ordered" the Mother not to put a certain pair of shoes on the Child and to throw them away, because the Petitioner's mother did not like them. A few days later, on August 20, 2019, after the Petitioner, the Mother and the Child returned to Armenia from France, the Petitioner discovered that the Mother had "disobeyed him" and did not throw the shoes away. In a fit of rage, the Petitioner aggressively confronted the Mother, in front of the Child, screaming at her that, as a woman, she must obey his orders or face the consequences. When the Mother responded that, as the Child's mother, she had a right to dress the Child, the Petitioner erupted in fit of physical violence against the Mother, striking her and tearing her clothes, in front of the Child. As he physically assaulted the Mother in front of the Child, the Petitioner screamed at the Mother that, because she is a woman, she had no rights and that she was inferior to him as a man. As his rage erupted, the Petitioner screamed at the Mother and the Child to "get the F##K out" of his apartment and his life. He physically handed the Child to the Mother and told her that she and the Child had one hour "to get the F##K out." It was late at night and the Child was sick with the flu. The Mother was shaking and crying, in fear for her life and the life of her Child. They

3

had no place to live, so the Mother called her mother and her brother to come pick her and the Child up. While the Mother was frantically trying to gather some of the Child's clothes and a few belongings to bring with her, the Petitioner called his mother in France and arrogantly bragged to her that he had thrown the Mother and the Child out of his apartment and his life and that his mother would never have to see them again. The Petitioner made it clear to the Mother that he wanted nothing to do with her or the Child and that they were not allowed to come back to his apartment or his life ever again. The Petitioner subsequently had the locks changed to his apartment to prevent them from doing so.

**B. Between August 21, 2019 and December 2019, the Petitioner was not exercising rights related to the child's care:**

Between August 21, 2019 and December 7, 2019, the Petitioner was not exercising rights related to the child's care. During this time, the Mother was the Child's full-time care giver and guardian. The Mother exclusively cared for and supported the Child full time, while the Petitioner refused to make any contribution to support the Child. The Mother had full responsibility for all of the Child's expenses, housing, clothing, food and medical care. Despite the Mother's numerous pleas for help, the Petitioner refused to make any child support payments or to support the Child in any way. (During his deposition, the Petitioner arrogantly asserted that he had supported the Child because he had bought some diapers.) While refusing to help support the Child, the Petitioner enjoyed the life of a bachelor. He spent lavishly on himself and traveled numerous times to various exotic places with various traveling companions. The Petitioner showed little, if any, concern for or interest in the welfare or care of the Child. The Petitioner had little, if any involvement in the Child's life.

4

**C. Between August 21, 2019 and December 2019, the Petitioner Did Not Exercise or Assert any Right to Determine the Child's Residence:**

After he abandoned them on August 20, 2019, the Petitioner did not exercise or assert any right to determine the Child's place of residence. When he threw them out on August 20, 2019, the Petitioner made it clear that he did not care where or how they lived. The Petitioner knew that the Mother had no means of supporting the Child or for paying for a place to live. The Petitioner knew that the Mother and the Child would have to rely upon the Mother's mother and her brother for housing and financial support. The Petitioner also knew that the Mother's brother lived in the United States. When the Mother told the Petitioner that she was going to travel with the Child to the United States to visit her brother, the Petitioner told the Mother the he "didn't give a F##k" what she did. Between August 21, 2019 and December 7, 2019, when the Mother traveled with the Child to the United States, the Petitioner never claimed that the Child should live with him. Between August 21, 2019 and December 7, 2019, the Petitioner never asserted any objection where the Child lived. Between August 21, 2019 and December 7, 2019, the Petitioner never asserted any right to determine the Child's place of residence.

**D. The Petitioner would not have exercised any rights of custody or support of the Child, but for the Child's visit to the United States with the Mother.**

Between August 20, 2019 and the end of December 2019, the Mother and the Petitioner discussed how to dissolve their marriage several times. They both understood that, under Armenian law there were basically two procedures they could pursue. One procedure was administrative and allowed the parties to easily terminate their marriage, but only if there was no need for a court order for child support. The other, when there was dispute over child support, was through a formal divorce proceeding in court. The Petitioner told the Mother that he had no interest in custody of the Child

and that his sole objective was not to pay child support. After August 20, 2019, the Child was living full time with the Mother and the Petitioner was enjoying the life of a bachelor, traveling with companions at will. The Petitioner made it clear that he had no interest in having custody of the Child and disturbing his bachelor life style or depleting his bank account to support the Child. The Petitioner did not want the Mother to file for divorce and to seek a court order for child support. The Petitioner repeatedly pressured the Mother to give up child support and have the marriage dissolved administratively. The Mother told the Petitioner numerous times that she had no way of supporting the Child on her own and that she needed child support to survive. The Petitioner repeatedly refused to pay child support or to agree to have an Armenian judge adjudicate the issue of child support. On December 14, 2019, after months of trying to get the Petitioner to voluntarily pay child support, the Mother told the Petitioner that she would have to file for a divorce in Armenia and have an Armenian judge order the Petitioner to pay child support.

**E. The Petitioner filed a petition for "wrongful removal" with this Court while he simultaneously sought to avoid the jurisdiction of the Armenian family court as a litigation tactic to avoid paying child support. As part of this strategy, the Petitioner never asserted in Armenian family court that he wanted custody of the Child, other than a litigation tactic in May, 2020.**

After December 14, 2019, when the Mother told the Petitioner that she was filing a divorce petition in Armenia, seeking an order of child support, the Petitioner hired a lawyer in Armenia, Ara Ghazaryan, who was well versed in both Armenian family law and the Hague Convention. Thereafter, the Petitioner and Mr. Ghazaryan coordinated a litigation strategy calculated to avoid the jurisdiction of the Armenian family court, so that the Petitioner could avoid paying child support, while they sought to punish the Mother into submission by bankrupting her by filing a bogus claim for "wrongful removal" before this Court. Beginning in December 2019, when the Petitioner hired Mr. Ghazaryan, the Petitioner's litigation strategy was to avoid service of process and seek to delay

6

the divorce action in Armenia, while simultaneously punishing and pressuring the Mother into submission by filing a frivolous Hague Convention action in the United States. This strategy was financially advantageous to the Petitioner because his American lawyers agreed to take the case pro bono. (Despite his cynical request in the Verified Petition that the Mother pay his legal fees in this action, the Petitioner's American counsel disclosed during the Petitioner's deposition that the Petitioner had no legal fees in this case because their law firm was doing the work pro bono).

When he filed his Verified Petition on April 1, 2019, the Petitioner's litigation strategy was to mislead this Court into believing that the Mother was in the United States with the Child, seeking to avoid the jurisdiction of Armenia. When he filed his Verified Petition, the Petitioner failed to disclose to this Court that, on January 13, 2020, the Mother had already submitted herself and all issues relating to the Child to the Armenian family court or that, on March 18, 2020, Judge Pilosyan found that the Petitioner had proper notice of the divorce proceedings. After the Mother disclosed the divorce action to this Court in her answer, Mr. Ghazaryan or someone from his law office appeared before Judge Pilosyan for the Petitioner on April 28, 2020 and sought to delay the divorce action in Armenia. This effort to delay the proceedings in Armenia was coordinated with the Petitioner's motion to expedite a final hearing before this Court. Subsequently, cynically and somewhat absurdly, after the Mother disclosed the divorce action to this Court, the Petitioner argued before this Court that the divorce action in Armenia was irrelevant to this Court's determination, because the Petitioner had not contested the Mother's custody of the Child before Judge Pilosyan. After this Court questioned the illogic of the Petitioner's position during a hearing, the Petitioner and Mr. Ghazaryan, evidently somewhat embarrassingly, modified their litigation strategy by filing a counterclaim for custody before Judge Pilosyan in May, 2020. When this Court issued its June 11, 2020 Order instructing the parties to seek a determination before the Armenian

Authority on the issue of whether the Petitioner's custody rights had been violated, the Petitioner, evidently concerned that Judge Pilosyan would find that the Petitioner's rights were not violated, argued that Judge Pilosyan and the family court in Armenia was not the proper forum to make such a determination. Instead, the Petitioner sought to offer to this Court a bogus "determination" from what would appear to be a connection which Mr. Ghazaryan apparently has at the Armenian Ministry of Justice. Subsequently, on July 30, 2020 during the Final Pre-Trial Hearing, the Court ruled that the Petitioner failed to substantiate his former claim that the letter from the Armenian Ministry of Justice was a determination of the Armenian Authority and that the letter was inadmissible. After months of smoke and mirrors, the Petitioner's litigation strategy is now clear and consistent: mislead this Court into believing that the Mother has kidnapped the Child, while punishing and pressuring the Mother into submission by bankrupting her and threatening to take the Child away. The Petitioner's litigation strategy is cynically and sadistically calculated to avoid paying child support and to punish the Mother for "disobeying" him.

## 2. The Petitioner Poses a Risk of Grave Harm to the Mother and the Child. The Court Should Deny the Petition

The Petitioner is a dangerous, violent man who is cunning and calculating. On December 7, 2019, when the Mother's mother informed the Petitioner that the Mother and the Child had traveled to the United States, the Petitioner responded by making the following threat: "Enjoy your peace and happiness a little more because it is not going to last long. You'll see what trouble I'm going to get Lilit into. Very soon I will remove Lilit (not the Child) back to Armenia in a disgraceful manner, where very cruel days await her. I promise you. I do whatever I say." This threat is credible and should be taken seriously by the Court.

This was not the first time that the Petitioner expressed retribution against the Mother or threatened to inflict serious bodily harm on her or even kill her. The Petitioner has articulated misogynistic, chauvinistic beliefs and serious violent pathologies against the Mother specifically and against women in general which places the welfare of both the Mother and the Child in grave jeopardy, if he were to gain access to them.

The Petitioner has told the Mother "you can't imagine what a demon I am capable of turning into. Beware of me. Be careful not to infuriate me. You can't imagine how revengeful I am!" He has threatened to "slaughter" the Mother for asserting her parental rights: "Just wait another day and you'll see my real demons…I do not slaughter lambs, I slaughter humans." The Petitioner has told the Mother "I cut off tongues, legs, I behead" and that "I'll come and cut your tongue off. Don't you dare disobey me. Do not mess with me." The Petitioner is manipulative, sadistic and cunning. He has told the Mother "I am totally conscious of what I am doing. Your tongue has become too long. Do not dare disobey or object to me or else I will torture you so brutally I'll tear your ass apart." The Petitioner believes that women are property and do not have rights equal to men. When he abandoned the Mother and Child, he told the Mother "I intentionally kicked you out to humiliate you publicly. You are a dumped woman now. A divorced woman is worthless. I have rubbed you against the ground like a floor-cloth". The Petitioner believes the Mother, because she is a woman, has no rights. He also believes that, because the Child is female, she is his property. He has told the Mother that "I owe you no respect "… because you are not a rich man's daughter, I can treat you the way I want."

### 3. The Mother Reasonably Fears for Her Safety and the Safety of the Child:

The Mother reasonably fears that the Petitioner will carry out his vindictive threats of physical violence. She reasonably believes that the Petitioner is full of hatred towards women and that he regards them as slaves for use by men. The Mother reasonably fears that the Petitioner has dangerous mental and psychological pathologies in his hatred towards women that create a serious danger to her and the Child. The Mother is also concerned about the mentality of misogynistic, chauvinistic beliefs in Armenia that women are inferior to men and that women have no rights. She is particularly concerned that, in Armenia, divorced women are often battered and punished and are objects of harassment.

The Mother does not believe the Armenian police will protect her from the Petitioner. She reasonably believes that the police would view her as a "disobedient and slanderous" woman, complaining of her husband and dismiss her fears, telling her to cope with her "family issues" on her own, instead of protecting her. The Mother reasonably believes that, in Armenia, law enforcement bodies do not take threats of domestic violence seriously and that they refuse to protect vulnerable women or restrain those who threaten the physical safety of women. She believes that when the Petitioner actually harms her physically, even if charges were brought against him, he would use his political connections to dismiss the case and then seek further revenge against her and her Child. She is concerned that, if she and the Child are ordered to return to Armenia, because her family does not have political connections and there is no man by her side in Armenia to protect her, as her father is dead and her brother lives in Boston, the Petitioner will carry out his threats against her, and against the Child with impunity.

The Mother is reasonably in fear for the Child's safety, because she is female. She is concerned about her daughter's future the hands of a man she regards as a cruel misogynistic chauvinist. The Mother reasonably fears that the Petitioner will do serious physical and psychological harm to the Child, by imposing his perverse beliefs about women on her and physically and psychologically harming her if she would dare to disagree with his treatment of women. The Court should deny the Petition and issue the appropriate orders to protect the Mother and the Child from the Petitioner's expressed intention to inflict serious bodily harm.

## 1. STATEMENT OF FACTS

The parties have filed an Agreed Statement of Facts (See Docket # 31).

## 2. CONTESTED ISSUES OF FACT RELATED TO PHASE ONE:

The Respondent proposes and the Petitioner contests the following issues:

1. When the Mother traveled with the Child for a visit to Boston in December 2019, the Petitioner was not actually exercising rights of custody.

2. On August 20, 2019, the Petitioner abandoned the Mother and the Child.

3. On August 20, 2019, four months before the Mother traveled to Boston, the Petitioner abandoned the Mother and the Child when, in a fit of rage, he ordered them out of "his apartment" in Armenia and told them to never return. The incident occurred late at night, a few days after the Petitioner, the Mother and the Child returned from a visit to the Petitioner's mother's home in France.

4. During the visit to France, the Petitioner "ordered" the Mother not to put a certain pair of shoes on the Child and to throw them away, because the Petitioner's mother did not like them.

5. A few days later, when the Petitioner, the Mother and the Child returned to Armenia form France, the Petitioner discovered that the Mother had "disobeyed him" and did not throw the shoes away. In a fit of rage, the Petitioner aggressively confronted the Mother, in front of the Child, screaming at her that, as a woman, she must obey his orders or face the consequences.

6. When the Mother responded that she liked the shoes and as the Child's mother she had a right to dress the Child, the Petitioner erupted in fit of physical violence against the Mother, striking her and tearing her clothes, in front of the Child.

7. As he physically assaulted the Mother in front of the Child, the Petitioner screamed at the Mother, that, as a woman, she had no rights, that she was inferior to him as a man.

8. As his rage erupted, the Petitioner screamed at the Mother, and "ordered" her and the Child to "get the F##K out" of his apartment and his life.

9. The Petitioner handed the Child to the Mother and told the Mother that she and the Child had one hour "to "get the F##K out." It was late at night and the Child was sick with the flu.

10. The Mother was shaking and crying, in fear for her life and the life of her Child. They had no place to live, so the Mother called her mother and her brother to come pick her and the Child up.

11. While the Mother was frantically trying to gather some of the Child's clothes and a few belongings to bring with her, the Petitioner called his mother in France and arrogantly bragged to her that he had thrown the Mother and the Child out of his apartment and his life and that his mother would never have to see them again.

12. The Petitioner made it clear to the Mother that he wanted nothing to do with her or the Child and that they were not allowed to come back to "his apartment" ever again. The Petitioner subsequently had the locks changed to prevent them from doing so.

13. On August 20, 2019, the Petitioner told the Mother that he did not care where she and the Child lived.

14. When the Mother told the Petitioner that she was going to travel with the Child to the United States to visit her brother, the Petitioner told the Mother the he "didn't give a F##k" what she did.

15. After the Petitioner abandoned the Mother and the Child on August 20, 2019, the Petitioner was not actually exercising rights related to the child's custody, care or residence.

16.     After the Petitioner abandoned the Mother and the Child on August 20, 2019, the Child lived full time with the Mother at the maternal grandmother's home.

17.     After the Petitioner abandoned the Mother and the Child on August 20, 2019, the Mother cared for and supported the Child.

18.     After the Petitioner abandoned the Mother and the Child on August 20, 2019, the Petitioner refused to contribute to the support the Child.

19.     The Petitioner would not have exercised rights of custody, but for the Child's visit to the United States with the Mother.

20.     After the Petitioner abandoned the Mother and the Child on August 20, 2019, the Petitioner never sought custody of the Child in an Armenian family court, other than a litigation tactic in May, 2020.

21.     Between August 21, 2019 and December 2019, the Mother was the Child's full-time care giver and guardian.

22.     Between August 21, 2019 and December 2019, the Mother exclusively cared for and supported the Child full time, while the Petitioner refused to make any contribution to support the Child.

23.     Between August 21, 2019 and December 2019, the Mother had full responsibility for all of the Child's expenses, housing, clothing, food and medical care.

24.     Between August 21, 2019 and December 2019, despite the Mother's numerous pleas for help, the Petitioner refused to make any child support payments or to support the Child.

25.     Between August 21, 2019 and December 2019, while refusing to help support the Child, the Petitioner enjoyed the life of a bachelor.

26.     Between August 21, 2019 and December 2019, the Petitioner showed little, if any, concern for or interest in the welfare or care of the Child.

27.     Between August 21, 2019 and December 2019, the Petitioner had little, if any involvement in the Child's life.

28.     Between August 21, 2019 and December 2019, the Petitioner did not care where the Child lived.

29.     After he abandoned the Child on August 20, 2019, the Petitioner knew that the Mother had no means of supporting the Child or for paying for a place to live and that she would have to rely upon her mother and her brother for housing and financial support.

30. Between August 21, 2019 and December 2019, the Petitioner never claimed that the Child should live with him.

31. Between August 21, 2019 and December 2019, the Petitioner never claimed that he had any objection to the Child's place of residence.

32. Between August 21, 2019 and December 2019, the Mother and the Petitioner discussed how to dissolve their marriage several times.

33. Between August 21, 2019 and December 2019, the Mother and the Petitioner understood that, under Armenian law there were basically two procedures they could pursue to terminate their marriage. One procedure was administrative and allowed the parties to easily terminate their marriage, but only if there was no need for a court order for child support. The other, when there was dispute over child support, was through a formal divorce proceeding in court.

34. Between August 21, 2019 and December 2019, the Petitioner told the Mother that he would not pay child support under any circumstances.

35. Between August 21, 2019 and December 2019, the Petitioner told the Mother that and that he had no interest in custody of the Child.

36. Between August 21, 2019 and December 2019, the Petitioner was enjoying the life of a bachelor.

37.     Between August 21, 2019 and December 2019, the Petitioner was traveling with his companions at will.

38.     Between August 21, 2019 and December 2019 had no interest in disturbing his bachelor life style or depleting his bank account to take care of the Child.

39.     Between August 21, 2019 and December 2019, the Petitioner tried to get the Mother to agree to give up all claims for child support, by having the marriage dissolved administratively.

40.     Between August 21, 2019 and December 2019, the Petitioner told the Mother that he did not want custody of the Child and that didn't want to have to pay child support.

41.     Between August 21, 2019 and December 2019, the Petitioner tried to get the Mother to waive child support and dissolve the marriage administratively.

42.     Between August 21, 2019 and December 2019, the Mother told the Petitioner numerous times that she had no way of supporting the Child on her own and that she needed child support.

43.     Between August 21, 2019 and December 2019, the Petitioner repeatedly refused to agree to pay child support or to agree to have an Armenian judge adjudicate the issue of child support.

44. On or about December 14, 2019, the Mother told the Petitioner that she would file for a divorce in Armenia and have an Armenian judge order the Petitioner pay child support.

45. After December 14, 2019, when the Mother told the Petitioner that she was filing a divorce petition in Armenia, seeking an order of child support, the Petitioner hired a lawyer in Armenia, Ara Ghazaryan, who was well versed in both Armenian family law and the Hague Convention.

46. Thereafter, the Petitioner and Mr. Ghazaryan coordinated a litigation scheme calculated to avoid the jurisdiction of the Armenian courts so that the Petitioner could avoid paying child support, while they sought to punish the Mother into submission by bankrupting her by filing a frivolous claim for "wrongful removal" before this Court.

47. Despite his request in the Petition that the Mother pay his legal fees in this action, the Petitioner had no legal fees in this case because the law firm that represents him is doing the work pro bono.

48. The Petitioner's litigation strategy was to avoid service of process and hide the divorce action in Armenia from this Court, so the Petitioner could claim before this Court that the Mother was in the United States, seeking to avoid the jurisdiction of Armenia.

49. At the earliest stages of this case, the Petitioner failed to disclose that the Mother had already submitted herself and all issues relating to the Child Armenia.

50. The Petitioner failed to disclose that, on January 13, 2020, the Mother filed divorce action in Armenia against him, seeking child support and that on March 18, 2020, Judge Pilosyan found that he had proper notice of the divorce proceedings.

51. The Petitioner also failed to disclose that under Armenian law, Judge Pilosyan has jurisdiction over all issues related to the Child, including child custody.

52. When the Mother disclosed the divorce action to this Court in her answer, someone form Mr. Ghazaryan's office appeared before Judge Pilosyan for the Petitioner on April 28, 2020 and sought to delay the divorce action in Armenia.

53. The Petitioner's effort to delay the proceedings in Armenia was coordinated with the Petitioner's motion to expedite a final hearing before this Court.

54. After the Mother disclosed the divorce action to this Court, the Petitioner argued before this Court that the divorce action was irrelevant to this Court's determination, because the Petitioner had not raised the issue of child custody before the family court in Armenia.

55. In May, 2020, after the Mother disclosed the divorce action to this Court, and after this Court questioned why the Petitioner never claimed custody in the divorce proceedings in Armenia, the Petitioner modified his litigation strategy by filing a counterclaim for custody in Armenia.

56. After this Court issued its June 11, 2020 Order instructing the parties to seek a determination before the Armenian Authority on the issue of whether the Petitioner's custody rights had been violated, the Petitioner initially argued that the family court in Armenia was not the proper forum to make such a determination.

57. From late December 2019, when the Petitioner hired Mr. Ghazaryan, the corner stone of the Petitioner's litigation strategy was to avoid service of process and seek to delay the divorce action in Armenia while simultaneously punishing and pressuring the Mother into submission by filing a frivolous Hague Convention action in the United States.

58. This strategy was finically advantageous to the Petitioner because his American lawyers agreed to take the case pro bono.

59. When he filed his Verified Petition on April 1, 2019, the Petitioner's litigation strategy was to mislead this Court into believing that the Mother was in the United States with the Child, seeking to avoid the jurisdiction of Armenia.

60. The Petitioner repeatedly failed to disclose to this Court that the Mother had already submitted herself and all issues relating to the Child to the Armenian family court.

61. Specifically, the Petitioner failed to disclose that, on January 13, 2020, the Mother filed divorce action in Armenia against him, seeking child support and that on March 18, 2020, Judge Pilosyan found that the Petitioner had proper notice of the divorce proceedings.

62. The Petitioner also failed to disclose that under Armenian law, Judge Pilosyan has jurisdiction over all issues related to the Child, including child custody.

63. When the Mother disclosed the divorce action to this Court in her answer, Mr. Ghazaryan or someone from his law office appeared before Judge Pilosyan for the Petitioner on April 28, 2020 and sought to delay the divorce action in Armenia. This effort to delay the proceedings in Armenia was coordinated with the Petitioner's motion to expedite a final hearing before this Court.

64.     Initially, the Petitioner argued before this Court that the divorce action was irrelevant to this Court's determination, because the Petitioner had not raised the issue of child custody before Judge Pilosyan.

65.     In May, 2020, after this Court questioned the Petitioner's position during a hearing, the Petitioner modified his litigation strategy by filing a counterclaim for custody in Armenia.

66.     After this Court issued its June 11, 2020 Order instructing the parties to seek a determination before the Armenian Authority on the issue of whether the Petitioner's custody rights had been violated, the Petitioner argued that the family court in Armenia was not the proper forum to make such a determination.

67.     After this Court issued its June 11, 2020 Order instructing the parties to seek a determination before the Armenian Authority on the issue of whether the Petitioner's custody rights had been violated, the Petitioner sought to offer in evidence before this Court a bogus "determination" from a political connection Mr. Ghazaryan apparently had at the Armenian Ministry of Justice.

68.     Subsequently, on July 30, 2020 during the Final Pre-Trial Hearing, the Court found that the Petitioner failed to substantiate his former claim that the letter from the Armenian Ministry of Justice was a determination of the Armenian Authority.

69.     The Petitioner is a dangerous, violent man.

70.     On December 7, 2019, when the Mother's mother informed the Petitioner that the Mother and the Child had traveled to the United States, the Petitioner responded "Enjoy your peace and happiness a little more because it is not going to last long. You'll see what trouble I'm going to get Lilit into. Very soon I will remove Lilit (not the Child) back to Armenia in a disgraceful manner, where very cruel days await her. I promise you. I do whatever I say." This threat is credible and is taken seriously by the Court.

71.     The threat of violence and retribution which the Petitioner made on December 7, 2019 was not the first time that the Petitioner expressed his intention to inflict serious bodily harm on the Mother.

72.     The Petitioner has demonstrated serious violent pathologies against females which places the welfare of both the Mother and the Child in grave jeopardy, if he were to gain access to them.

73.     The Petitioner has repeatedly expressed his intention to inflict serious bodily harm on the Mother and even kill her. This threat is credible and should be taken seriously by the Court.

74.    Through his own words and conduct, the Petitioner has demonstrated serious violent pathologies against females which places the welfare of both the Mother and the Child in grave jeopardy, if he were to gain access to them.

75.    The Petitioner has told the Mother "you can't imagine what a demon I am capable of turning into. Beware of me. Be careful not to infuriate me. You can't imagine how revengeful I am!"

76.    The Petitioner has threatened to "slaughter" the Mother for asserting her parental rights.

77.    The Petitioner has told the Mother "Just wait another day and you'll see my real demons…I do not slaughter lambs, I slaughter humans."

78.    The Petitioner has told the Mother "I cut off tongues, legs, I behead" and that "I'll come and cut your tongue off. Don't you dare disobey me. Do not mess with me."

79.    The Petitioner has told the Mother "I am totally conscious of what I am doing. Your tongue has become too long. Do not dare disobey or object to me or else I will torture you so brutally I'll tear your ass apart."

80.     The Petitioner believes that women are property and do not have rights equal to men.

81.     The Petitioner told the Mother "I intentionally kicked you out to humiliate you publicly. You are a dumped woman now. A divorced woman is worthless. I have rubbed you against the ground like a floor-cloth".

82.     The Petitioner believes the Mother, because she is a woman, has no rights. He also believes that, because the Child is female, she is his property.

83.     The Petitioner has told the Mother "I owe you no respect "… because you are not a rich man's daughter, I can treat you the way I want".

84.     The Mother reasonably fears that the Petitioner will carry out his vindictive threats of physical violence and dismemberment.

85.     The Mother reasonably fears that the Petitioner has dangerous mental and psychological pathologies in his hatred towards women that create a serious danger to her and the Child.

86. The Mother is also concerned about the mentality of misogynistic chauvinistic beliefs in Armenia that women are inferior to men and that women have no rights. She is particularly concerned that, in Armenia, divorced women are often battered and punished and are objects of harassment.

87. The Mother does not believe the Armenian police will protect her from the Petitioner.

88. The Mother reasonably believes that, in Armenia, law enforcement bodies do not take threats of domestic violence seriously and that they refuse to protect vulnerable women of re-strain those who threaten the physical safety of women.

89. The Mother reasonably believes that when the Petitioner actually harms her physically, even if charges were brought against him, he would use his political connections to dismiss the case and then seek further revenge against her and her Child.

90. The Mother is reasonably in fear for the Child's safety, because she is female. She is con-cerned about her daughter's future the hands of a cruel misogynistic chauvinist who believes that women are inferior to men and that women have no rights.

91.     The Mother reasonably fears that the Petitioner will do serious physical and psychological harm to the Child, by imposing his perverse beliefs about women on her and physically harming her if she would dare to disagree with his treatment of women. The Mother and the Child are currently visiting the United States on a tourist visa.

92.     While she was visiting the US on her tourist visa the Mother was informed by the United States government that she should seek an extension of her and the child's VISA due to the COVID pandemic.

93.     Due to the risks associated with travel during the COVID pandemic, the Mother has not purchased a plane ticket, travel reservation, or other transportation to return to Armenia while she has stayed with her brother in the United States.

94.     Since August 21, 2020, the Petitioner has made no financial contributions to the support of the child.

95.     In the divorce proceedings in Armenia the Petitioner has opposed the Mother's efforts to get the him to pay child support.

96.     In the divorce proceedings in Armenia, in opposition to the Petitioners' position, the court has ordered the him to pay child support to the Mother of $40.00 a month.

97.    As of the date of this hearing, the Mother has not received any child support from the Petitioner.

## 2.  REQUESTS FOR AMENDMENTS TO PLEADINGS

The Respondent does not anticipate requests for amendments to the pleadings other than to state that the Petitioner's theory of the case is wrongly framed under the Hague Convention. The Petitioner's case is not one of an alleged violation of "custody rights", as the Petitioner never had custody of the Child. Rather, the Petitioner's claims are for "access rights." See **Viragh v. Foldes**, 415 Mass. 96, 612 N.E. 2d 241, 61 USLW 2732 (1993). The Mother states that she has disclosed this to the Petitioner's counsel by sending him a copy of this case by email on July 29, 2020.

## 3.  ADDITIONAL TRIAL RELATED MATTER

The Respondent does not anticipate additional matters at this time.

## 4.  LENGTH OF TRIAL

Respondent anticipates 2 days for Phase One of the trial.

## 5.  PHASE ONE - WITNESS LIST

Name:        Lilit Sargsyan – Respondent

Name:        Aram Sargsyan – Respondent's Brother

Name:        Lala Sargsyan – Respondent's Mother

## 6. LIST OF PROPOSED EXHIBITS

The parties have filed a Joint Exhibit List (See Docket # 32).

**WHEREFORE,** the Respondent, moves that the Court deny the Petition and award her attorneys'

fees and costs.

Lilit Sargsyan,

By Her Attorneys,

/s/Harry M. Haytayan, Jr.
Harry M. Haytayan, Jr.
B.B.O. #548946
Haytayan & Haytayan, PLLC
303 Wyman Street, Suite 300
Waltham, Massachusetts 02451
Tel. No. 617-833-2443
harry@haytayanlaw.com
**FIRM MAILING ADDRESS**
Haytayan & Haytayan, PLLC
One Tara Boulevard, Suite 200
Nashua, New Hampshire 03062
Tel. No. 603-921-1336

### Certificate of Service

I hereby certify that on July 31, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Massachusetts by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system

/s/Harry M. Haytayan, Jr.
Harry M. Haytayan Jr.

## CERTIFICATIONS

I, Harry M. Haytayan, Jr. hereby certify the following:

1. Parties conferred on the matter of settlement and as of the date of this filing, the parties have been unable to come to an agreement on the contested matters.

2. Parties have drafted and signed a Stipulation of all uncontested Facts which has been filed with this Court as Document No. 31.

3. Counsel for the parties have conferred and will exchange copies of any and all photographs, documents, instruments, and other objects any party intends to offer as exhibits at the Phase One Evidentiary hearing, including the translations of Armenian text.

4. Notice of the names and addresses of witnesses has been exchanged.

5. The parties have conferred on logistical matters and arrangements related to remote testimony and agreed to a translator as needed by the witnesses.


/s/Harry M. Haytayan, Jr.
Harry M. Haytayan, Jr.