UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HAYK HARUTYUNYAN, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No.  20-cv-10650-IT |
| | * | |
| LILIT SARGSYAN, | * | |
| | * | |
| Respondent. | * | |

**Findings of Fact and Conclusions of Law**

August 25, 2020

I.    Introduction

On December 7, 2019, Respondent Lilit Sargsyan traveled with her one-and-a-half-year-old daughter, A.H., from the Republic of Armenia, their country of habitual residence, to the United States. They are here as tourists, visiting Lilit Sargsyan's brother in Boston, Massachusetts. Petitioner Hayk Harutyunyan, Respondent's husband and A.H.'s father, brought this action pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 ("the Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq. See Verified Petition for Return of Child to Armenia ("Verified Petition") [#1]. Petitioner contends that Respondent's removal of the child from Armenia was wrongful under the Convention. Verified Petition ¶¶ 27-39 [#1]. He seeks the return of the child to Armenia, as well as costs, fees, and expenses. Verified Petition ¶¶ 58(a), (d) [#1].[1]

---

[1] The Petition also sought an order requiring Respondent to allow visitation between Petitioner and the child while Petitioner was in the United States for this proceeding. Id. ¶ 58(b). However, in light of the coronavirus pandemic, all proceedings were conducted remotely, allowing for Petitioner's participation without travel to the United States. Petitioner has made no further request regarding visitation.

1

Respondent opposes the child's immediate return. See Verified Answer to Petition for Return of Child ("Verified Answer") [#13]. She contends further that this action was brought in bad faith and has raised various defenses. See id. at 1, 12-13, 23-26. She also seeks her costs, fees, and expenses. Id. at 26.

The court bifurcated proceedings, and held an evidentiary hearing on August 6, 7, and 11, 2020, at which Petitioner, Respondent, Respondent's mother Lala Sargsyan, and Respondent's brother Aram Sargsyan testified to address: (1) whether Petitioner had been actually exercising any rights of custody he may have legally had prior to the child's removal from Armenia or would have actually exercised any such rights but for the removal, see Convention arts. 3(b), 5(a), 13(a); and (2) Respondent's affirmative defenses. See Convention arts. 13, 20. The court deferred testimony from the Parties' expert witnesses on the question of whether Petitioner had legal custody of the child under Armenian law at the time of the child's removal to a subsequent evidentiary hearing should their testimony be necessary to resolve the matter.

II.    Findings of Fact

The court finds the following facts based on witness testimony (including the court's credibility determinations, where material testimony conflicted), and the parties' stipulations and exhibits as cited herein.

   A.  Background

      1.  Petitioner Hayk Harutyunyan was born and grew up in Yerevan, Armenia, and is a citizen of Armenia. Joint Stipulation of Uncontested Facts ("First Joint Stip.") ¶ 4 [#31]. He is 36 years old and works as a lecturer at a medical university and as a general surgeon.

2. Respondent Lilit Sargsyan was born in and grew up in Armenia and is a citizen of Armenia. First Joint Stip. ¶ 5 [#31]. She is 32 years old and holds a Ph.D. in English philology from Yerevan State University.

3. Hayk Harutyunyan and Lilit Sargsyan commenced a relationship in 2016 in Armenia. First Joint Stip. ¶ 7 [#31]. They married on or about April 20, 2017, in Yerevan, Armenia, and remain married. Id. at ¶¶ 1, 8.

4. In 2018, Petitioner and Respondent had a daughter, A.H.[2] ("the child"). Id. ¶ 2. Petitioner Hayk Harutyunyan is listed on the child's birth certificate. Id. at ¶ 9.

5. The child was born in and is a citizen of Armenia. Id. at ¶¶ 2-3. The child's country of habitual residence is Armenia. Id. at ¶ 6.

6. The child resided from birth until approximately age 1 with both parents in an apartment owned by Petitioner in Yerevan, Armenia. Id. at ¶¶ 13-14.

7. The child's maternal grandmother, Lala Sargsyan, and a maternal great-grandmother reside in Armenia. The child has enjoyed significant contact with the maternal family in Armenia. Id. at ¶¶ 11-12.

8. Respondent's brother, Aram Sargsyan, currently resides in the United States as a permanent resident. Id. at ¶ 20. In August, September, and October 2019, he was staying with Lala Sargsyan in Yerevan, Armenia.

9. Petitioner's mother and sister reside in France.

B. Text Conversations Between the Parties Shortly after the Child was Born

10. In an August 27, 2018 Facebook message, Respondent wrote to Petitioner: "Get rid of that evil feeling inside you, a demon has risen inside you and is ruining us…I hope we

---

[2] In the interest of protecting the child's privacy, the court includes only her initials and year of birth, but notes her approximate age.

talk and understand each other and settle everything…You will feel sorry for this conduct of yours later but it is impossible to turn back the hands of time…We are not enemies. At least, I consider you a dear person to me though I do not feel the same on your part. But I am sure this feeling will pass too. Everything will be the way it used to be." Petitioner replied: "Just wait another day and you'll see the real demons." Exh. 38 at 00273.

11. In a September 10, 2018 Facebook message, Petitioner asked Respondent how she slept. Exh. 38 at 00275. She replied that the child was asleep now but had been disquiet in the night. Id. The two argued about whether Respondent is overreacting. Id. at 00275-00277. Eventually, Respondent wrote: "…I speak to you calmly and politely and you keep on assaulting me in response. And I will not call the pediatrician. Don't worry." Id. at 00277. Petitioner responded: "There is no meanness in me. And my brain works fine. Your tongue has gotten too long. When I'm telling you something, listen. And don't argue. Otherwise, I will torment you. I will tear your ass into pieces."[3] Petitioner, when asked to explain the final comment, said that he meant that he would return home and they would have sexual intercourse.

C. Events Around the Time of the Parents' Separation (When the Child is Approximately One Year Old)

12. On or about July 25, 2019, Petitioner and Respondent traveled with the child to visit Petitioner's family in France. First Joint Stip. ¶ 15 [#31]. They returned to Armenia on or about August 15, 2019. Id. at ¶ 16.

---

[3] Parties disputed the proper translation of this passage. See Exh. 12 at 012455; Exh. 38 at 00277. At the August 6, 2020, hearing, it was agreed that the live interpreter's English version would be considered the official translation.

4

13. On August 19, 2019, Petitioner and Respondent had an argument. Second Joint Stipulation of Uncontested Facts ("Sec. Joint Stip.") ¶ 4 [#44].

14. The argument began while they were in the elevator of their apartment building returning home. Petitioner and Respondent had a disagreement about the child's shoes. When Respondent contended that, as the child's mother, she had a right to dress the child as she saw fit, Petitioner told Respondent that she had no rights to make decisions regarding their child. He told her that, as a woman, she was his inferior.

15. Exiting the elevator, Petitioner shoved Respondent hard near her shoulder blade and kicked her legs.

16. When they entered the apartment, Petitioner told Respondent that he should have smashed her head between the door and the wall a year earlier when the child was born. He told her that he was fed up with family life, with her, and with the baby, and that he did not want them in his house anymore. Petitioner told Respondent to take the baby and get out.

17. Respondent called her brother, Aram Sargsyan, who at the time was staying with Lala Sargsyan in Yerevan, Armenia. Aram and Lala Sargsyan rushed over to the apartment.

18. Before they arrived, Petitioner told Respondent that he had warned her to obey him or he would throw her out in the street and the child with her.

19. When Aram Sargsyan and Lala Sargsyan arrived, Aram Sargsyan asked Petitioner what was going on. Petitioner stated that his wife was required to obey him and, because she did not, he wanted her to leave the home and take the child with her. Petitioner also told Lala Sargsyan that because Respondent was not the daughter of a

wealthy man, he did not have to respect her and that he had considered this fact in choosing to marry her.

20. After approximately half an hour, Aram Sargsyan and Lala Sargsyan left and Petitioner, Respondent and the child stayed in the apartment.

21. On the following morning, August 20, 2019, Petitioner awoke and went to work. When he returned home, at approximately 9:30 p.m., he told Respondent that he wanted her and the child to leave the apartment.

22. Respondent called her mother, who asked Aram Sargsyan to take her to Petitioner and Respondent's home.

23. While Respondent was packing, Petitioner took the child into the living room and placed a video call to his mother in France. He told her to say goodbye to A.H. because she would not see A.H. again in that home.

24. Petitioner then placed a video call to his sister. He showed the child to his sister and told her that she would never have to hear the baby again. He told his sister to say goodbye because he was throwing Respondent and the child out.

25. When Aram Sargsyan and Lala Sargsyan arrived at the apartment at approximately 11 p.m., Respondent was packing.

26. Lala Sargsyan asked Petitioner to rethink his decision. He told her that she had not expected him to do something like this because she did not know him very well. He told her that he was capable of worse things. Then he told her that, as an educator, she knew that half of all children grew up in broken families and that his child would be fine. He told her that he did not regret his decision because he loves himself most of all.

27. Petitioner then put the sleeping one-year-old child, wrapped in a blanket, into Respondent's arms and told her to get out. She did.

28. Respondent, A.H., Aram Sargsyan, and Lala Sargsyan left the apartment and went out to the car. Respondent realized that she had forgotten a few items.

29. Respondent and her brother returned to the apartment to gather the items. While they were there, Petitioner told them not to forget anything else because they would not be coming back to disturb his sleep.

30. Respondent and A.H. went with Aram Sargsyan and Lala Sargsyan to Lala Sargsyan's apartment.

31. On August 21, 2019, Lala Sargsyan observed bruising on Respondent's back near her shoulder blade.

32. On August 22, 2019, Petitioner noticed that Respondent had returned to the apartment while he was gone and taken things from the safe. After noticing that Respondent had taken things from the safe, he changed the locks. He told Respondent in a December 14, 2019 conversation on Viber, a messaging application: "I changed the entrance locks because you are a thief. You opened my safe and took everything." Exh. 13 at 002387.

33. Petitioner was aware that Respondent had taken the child's passport from the safe. At no point did Petitioner express concern about the child's passport. He also made no statements to Respondent indicating that he did not want the child to travel internationally or to use the passport.

34. In September 2019, Respondent told Petitioner that she intended to travel with the child to Boston to visit her brother. She did not specify when she would travel and at

that time, her brother was still in Armenia. Petitioner told her, using an expletive, that he did not care what she did. He told her that he had kicked her and the child out and that she should go wherever she wanted and do whatever she wanted so long as she freed up his apartment.

D. August 20, 2019 to December 7, 2019: Care for the Child

35. As of the night of August 20, 2019, Respondent and the child ceased to permanently reside at Petitioner's apartment. Sec. Joint Stip. ¶ 5 [#44].

36. From the night of August 21, 2019, until December 7, 2019, Respondent and the child resided with Lala Sargsyan in her apartment in Yerevan, Armenia.

37. Since August 21, 2019, Respondent has been the primary provider of food, housing, and clothing for the child. Sec. Joint Stip. ¶¶ 9, 14 [#44].

38. Shortly after their separation, in August 2019, Respondent asked Petitioner for money to support the child and he told her that he would never give her a penny.

39. In September 2019, when Respondent was picking up some additional belongings at Petitioner's apartment, she asked again for financial assistance in supporting the child. He told her that he would not help her because he had kicked her out to punish her for her arrogance and it was time that she saw what it was like to be a single mother, supporting the child on her own. He told her that he wanted to see her back bent under the burden of everyday responsibilities.

40. To date, Petitioner has not given Respondent any money for the care of the child. Sec. Joint Stip. ¶ 10 [#44].

41. Between August 21, 2019, and December 7, 2019, Petitioner bought diapers for the child. Id. at ¶ 22.

42. On October 15, 2019, Petitioner told Respondent that she should have "told him properly what is needed" for the child. <u>See</u> Exh. 37 at 00219. Respondent replied:

> The child needs:
> 1. Warm winter blouses
> 2. Warm leggings or warm soft trousers
> 3. Baby tights
> 4. Warm slippers with supinator
> 5. A couple of bodysuits and a nightgown for 18-24-moth-old child
> 6. A pacifier
> And also, please bring her blue potty, I want her to get used to the potty, and the red one here is not comfortable. She also wants to have a baby tricycle.

<u>Id.</u> The following day, Petitioner responded "I have bought and will continue buying for my daughter whatever is necessary. As far as your demanding position is concerned, I am not going to buy anything from the list you have sent me or to receive such lists from you again…I am not going to raise my child to be a greedy brand-addict like you!!!...And don't you dare think tomorrow you can decide to take her to an upscale kindergarten or school in an attempt to fleece me…" <u>Id.</u> at 00220.

43. Between August 21, 2019, and December 7, 2019, Respondent took the child to a wellness visit with the doctor in mid-October, a sick visit in early November, a wellness visit in early December, and a visit with an oral facial surgeon for a fallen tooth at an unspecified date. Sec. Joint Stip. ¶¶ 25-26 [#44].

44. In September 2019, Petitioner took the child to receive vaccinations. <u>Id.</u> at ¶ 15.

45. In late November or early December 2019, Petitioner and Respondent together took the child to a dentist appointment. <u>Id.</u> at ¶ 23. While they were in the car after the appointment, Petitioner told Respondent that he had kicked her out of the apartment to publicly humiliate her, and reiterated his intention not to pay any money for the child's

support. He then instructed Respondent to get out of the car. Respondent exited the car with the child prior to reaching their destination.

E.   <u>August 21, 2019, to December 7, 2019: Petitioner's Other Contact with the Child</u>

46. Between August 21, 2019, and December 7, 2019, Petitioner would visit with the child. He did not conduct these visits on any regular schedule, but rather, when it was convenient for him to do so.

47. He typically came after work, at around 7 p.m. for these visits. He would drive to the grandmother's house and wait outside for Respondent to bring the child out to him. Sec. Joint Stip. ¶¶ 27-28 [#44]. He would take the child for approximately two hours and return her to Respondent. <u>Id.</u> at ¶ 29.

48. The frequency of these visits is unclear from the record but appears to be no less often than once every 7 to 10 days (except when Petitioner was traveling) and no more frequent than three times in a week.

49. During September 2019, the child stayed with Petitioner overnight approximately three times. Sec. Joint Stip. ¶ 2 [#44].

50. After an uncertain date in September 2019, Respondent decided that the child should no longer stay overnight with Petitioner. Petitioner did not object to her decision.

51. At no point in August, September, October, or November 2019 did Petitioner seek custody of the child in conversation with Respondent.

52. For approximately ten days in October 2019, Petitioner traveled to Barcelona, Spain, and Montpellier, France, for business and personal reasons. <u>See</u> Sec. Joint Stip. ¶ 21 [#44]. He did not see the child during his travels.

F.  December 7, 2019 to the Present

53. Respondent received her U.S. tourist visa in late November 2019, and subsequently
    bought plane tickets for herself and the child to travel to visit Respondent's brother in
    Boston, Massachusetts.

54. Respondent did not tell Petitioner about this specific trip in advance of her departure.
    Sec. Joint Stip. ¶ 30 [#44].

55. Respondent planned to tell Petitioner about the trip during the car ride back from
    taking the child to the dentist in late November or early December, but chose not to
    after he insulted her and told her to get out of the car.

56. Respondent and the child traveled to the United States on December 7, 2019, on a one-
    way ticket. Since arriving in the United States, Respondent and the child have stayed
    with Aram Sargsyan in his apartment in Boston, Massachusetts.

57. Respondent originally intended to stay at least to January 2020. See Exh. 13 at
    002384.

58. On December 7, 2019, Petitioner visited Lala Sargsyan's house to see the child. Lala
    Sargsyan informed him that Respondent and the child had traveled to visit
    Respondent's brother in the United States. Petitioner did not believe her.

59. Petitioner told Lala Sargsyan that if Respondent had dared to go to the United States
    she would regret it and that he would bring her back to Armenia in chains. He said that
    he would punish Respondent and that not only did he not regret throwing her and the
    child out, but he regretted not having done it a year sooner. He said that he would not
    provide any financial support for the child so that Respondent would rub her nose on

the ground. He told Lala Sargsyan to pass his words on to Respondent, and that he would call the next day to hear her reply.

60. Petitioner called Lala Sargsyan on December 8, 2019. She told him that Respondent had arrived in the United States, that she was certainly planning to return to Armenia, and that he could call her. Petitioner told Lala Sargsyan that she should enjoy her peaceful days because she would soon see what he would do to her daughter, her grandchild, and their family. He said that very cruel days were awaiting her and that he planned to drag Respondent back to Armenia, punish her, and turn her life into a living hell.

61. On December 8, 2019, Petitioner reached Respondent through Viber, a messaging application. Respondent informed him that she and the child were in the United States "for a holiday." See Exh. 13 at 002380. Petitioner did not believe her and accused her of lying. Id. at 002381. Respondent asked Petitioner to "stop bothering my mum and my grandma and stop offending me." Id.

62. Respondent has continued to facilitate video calls between Petitioner and the child. The calls are no less frequent than his visits in Armenia. When Respondent has missed a call from Petitioner, she has called him back within a reasonable period of time.

63. On December 14, 2019, Respondent told Petitioner that she wanted to legally divorce and would give her mother power of attorney to sign the necessary paperwork. Exh. 13 at 002387. Petitioner responded, "No, when you get back then we'll get legally divorced," and accused Respondent of "kidnapping [his] child." Id. Respondent denied "kidnap[ping]" the child and further replied, "Well it's up to you, I can apply to court but if I do I will ask for child support." Id.

64. On February 17, 2020, Respondent told Petitioner that she would return to Armenia in May. Exh. 13 at 002424. At the time, her tourist visa was set to expire in June 2020.

65. In March 2020, Respondent decided to further prolong her visit to the United States due to travel warnings and restrictions related to the novel coronavirus pandemic.

66. On or about March 17, 2020, she applied to extend her visa under both the tourist and student categories. Second Joint Stip. ¶ 31 [#44]. The applications remain pending.

67. Respondent does not currently have return plane tickets to Armenia.

68. As of August 5, 2020, the Center for Disease Control "recommends travelers avoid all nonessential travel to Armenia. Travelers at increased risk for severe illness from COVID-19 should consider postponing all travel, including essential travel, to Armenia. COVID-19 risk in Armenia is high. If you get sick in Armenia and need medical care, healthcare resources may be limited." Sec. Joint Stip. ¶ 32 [#44]. The U.S. Department of State notes that Armenia is permitting Armenian citizens to travel into the country. Id. at ¶ 33.

69. The child is, as of July 31, 2020, approximately 2 years old. First Joint Stip. ¶ 2 [#31].

G.  Legal Proceedings Between the Parties

70. Neither party has filed any criminal complaint or sought any restraining order against the other in Armenia.

71. Neither party filed any civil proceeding relating to the termination of their marriage or custody of the child prior to proceedings being initiated here.

72. At no point in August, September, October, or November 2019 did Petitioner speak to a lawyer or go to court to seek custody of the child, overnight visits, or a different

visitation schedule. Petitioner did not seek custody of the child in any Armenian court prior to seeking return of the child in this court.

73. On December 8, 2019, Petitioner met with an attorney in Armenia employed by the firm of Ashken Ghazaryan and hired the firm to represent him.

74. Despite Respondent's suggestion in December 2020 that divorce proceedings could be commenced in her absence, Petitioner declined to commence divorce proceedings.

75. Instead, on or about December 30, 2019, Petitioner submitted an Application in Accordance with the Hague Convention on the Civil Aspects of International Child Abduction seeking the return of the child to Armenia.

76. On or about January 13, 2020, Respondent filed a divorce application in Armenia seeking child support. See Exh. 14. The application asserts that "[t]he child presently resides with the petitioner, and the petitioner solely provides for the child's needs and care." Id. The application seeks "alimony…for the benefit of Lilit Sargsyan…to provide for A.H."

77. The Armenian judge adjudicating the parties' divorce found that Petitioner was aware of those proceedings as of March 18, 2020.

78. On April 1, 2020, Petitioner filed the Verified Petitioner for Return of Child to Armenia [#1] in this court. The Verified Petition made no mention of the Armenian divorce proceedings.

79. In April 2020, the Armenian judge hearing the couple's divorce case ordered Petitioner to pay child support, retroactive to January 2020, of 20,000 drams per month (approximately $40) to a court directed bank account, which he has done. Sec.

Joint Stip. ¶¶ 11-12 [#44]. This money has not, as of yet, been released to pay actual support of the child.

80. On April 27, 2020, Petitioner sought expedited scheduling in this matter. Mtn. to Expedite [#9]. Petitioner's <u>Motion</u> [#9] still made no mention of the Armenian divorce proceedings.

81. On May 4, 2020, Petitioner filed a counterclaim in the Armenian divorce proceedings seeking that the child's residence be his apartment and seeking the assignment of her primary care and upbringing to him. Exh. 35 at 00184.

III.   <u>Conclusions of Law</u>

The Hague Convention aims to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Convention pmbl. The stated objects of the Convention are twofold: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention art. 1. A decision under the convention concerning the return of the child "shall not be taken to be a determination on the merits of any custody issue." Convention art. 5(a). The court, thus, has jurisdiction to decide the merits of the wrongful removal claim, but may not decide the merits of the underlying custody dispute. <u>Kufner v. Kufner</u>, 519 F.3d 33, 38 (1st Cir. 2008) (citing <u>Whallon v. Lynn</u>, 230 F.3d 450, 455 (1st Cir. 2000)). Instead, the Convention "is generally intended to restore the pre-removal status quo and to discourage a parent from engaging in international forum shopping." <u>Id.</u>; <u>see also</u> <u>Baxter v. Baxter</u>, 423 F.3d 363, 367 (3d. Cir. 2005) ("[T]he Convention's procedures are designed to

restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases. The Convention is not designed to settle international custody disputes, but rather to ensure that cases are heard in the proper court").

Here, Respondent has submitted the question of custody to an Armenian court and is not engaged in international forum shopping.[4] Accordingly, with the concern that the custody case be heard in the proper court in Armenia resolved, the court turns to determine whether Petitioner's present or past custody rights have been violated by Respondent's temporary removal of the child from her country of habitual residence.[5]

It is the petitioner's burden to establish, by a preponderance of the evidence, that the child has been wrongfully removed within the meaning of the Convention. 22 U.S.C. § 9003(e)(1)(A). If the removal was wrongful, the court must order the child's return barring the success of any affirmative defenses.

A. <u>Was the Removal of the Child Wrongful?</u>

The removal of a child is considered wrongful under the Convention where: (1) "it is in

---

[4] The posture of this case thus differs from numerous other cases cited by the parties or otherwise considered by the court where the respondent parent had removed a child to the respondent's home country (the United States) and was seeking to avoid the courts of the child's country of habitual residence. <u>See e.g.</u> <u>Bader v. Kramer</u>, 484 F.3d 666 (4th Cir. 2007) (removing parent was a dual citizen of the United States and another country); <u>Baxter v. Baxter</u>, 423 F.3d 363 (3d. Cir. 2005) (same); <u>Whallon v. Lynn</u>, 230 F.3d 450 (1st Cir. 2000) (both parents were United States citizens who had been residing in Mexico); <u>Sealed Appellant v. Sealed Appellee</u>, 394 F.3d 338 (5th Cir. 2004) (U.S. citizen parent removed children from Australia); <u>Krefter v. Wills</u>, 623 F.Supp.2d 125 (D. Mass 2009) (U.S. citizen parent removed child from Germany).

[5] The question of possible wrongful retention is not ripe, where Respondent is a citizen and resident of the child's country of habitual residence who came to the United States on a tourist visa for a temporary stay. Although that temporary stay has been extended by the coronavirus pandemic, and Petitioner has pending applications for both an extension of the tourist visa and a student visa, no suggestion has been made that Respondent will not promptly return to Armenia if those applications are denied, or if so directed by the Armenian court.

breach of rights of custody attributed to a person…under the law of the State in which the child was habitually resident immediately before the removal" and (2) "at the time of removal…those rights [of custody] were actually exercised…or would have been so exercised but for the removal..." Convention art. 3.

Rights of custody "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention art. 3. Under the Convention, "rights of custody" are defined to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). "Rights of access," in contrast, are defined under the Convention as "the right to take a child for a limited period of time to a place other than the child's habitual residence." Id. "Having rights of custody is necessary to petition for return of a child, while having only rights of access does not entitle a party to petition for the return of a child to the place of habitual residence." Kufner v. Kufner, 519 F.3d 33, 39 (1st Cir. 2008); see also Abbott v. Abbott, 560 U.S. 1, 9 (2010) ("The Convention also recognizes 'rights of access,' but offers no return remedy for a breach of those rights" (citing Convention arts. 5(b), 21)).

    1.   Did Petitioner Actually Exercise Custody Rights?

In this bifurcated proceeding, the court has left to a second phase, if needed, the question of whether Petitioner had a legal right under Armenian law to determine the care of the child, and, in particular, the child's place of residence, at the time Respondent removed her from Armenia. Assuming that Petitioner did have such a right under Armenian law and would, thus, be considered to have had "rights of custody" under the Convention, see Convention art. 5(a), the court here examines whether Petitioner was actually exercising those "rights of custody" at the

time of the child's removal or would have exercised them but for that removal. <u>See</u> Convention art. 3(b).

The court finds that, at the time of the removal, Petitioner was not exercising rights of custody, and has failed to show that he would have exercised them but for the removal. The court credits Respondent's testimony that on August 20, 2019, Petitioner told his mother and sister that they would never see the child in his apartment again, and that he told Respondent to take A.H. with her when he expelled her from his apartment. The record is clear that Petitioner knew Respondent had come to the apartment and taken the child's passport in August 2019, and he nonetheless stated no objection to her traveling with the child internationally. To the contrary, in September 2019, when Respondent told Petitioner that she intended to travel with the child to Boston to visit her brother, he replied that he did not care what she did, he had kicked her and the child out, and she should go wherever she wanted so long as she freed up his apartment. The court finds no expressions by Petitioner of any concern, opinion, or interest as to the child's place of residence between the time he told Respondent to leave the apartment and her December 7, 2019 departure from Armenia. When Respondent terminated Petitioner's overnight visits with the child in September 2019, he did not object.[6]

From August 21, 2019, to December 7, 2019, Respondent provided the child with housing, food, and clothing, and had primary responsibility for the child's medical care and other expenses. Petitioner contributed to the child's upkeep by purchasing diapers, taking A.H. to a vaccination appointment, and, together with Respondent, taking A.H. to a dental appointment,

---

[6] The court does not find his failure to object to the termination of overnight visits to be mere diplomacy. Petitioner did not, at other times, avoid making inflammatory remarks or engaging in arguments in the interest of keeping the peace. Moreover, though he had the means and knowledge of how to consult with an attorney (as demonstrated by his prompt action when Respondent's mother told him that Respondent had left), he made no efforts to speak with an attorney in response to the parenting arrangement from August 21, 2019 to December 7, 2019.

but assumed no other obligations for her housing or daily care, and repeatedly refused Respondent's requests for financial contributions to the child's support. From September through November 2019, while Petitioner did visit with the one-year old child with some frequency, he did so on an irregular schedule, when it suited him, and for only approximately two hours at a time. Petitioner also traveled internationally for approximately ten days in October 2019 for both business and pleasure, without any obligations for the care of the child.[7] The court finds that the rights Petitioner exercised in the months prior to Respondent's removal of the child are "rights of access" under the Convention, and not "rights of custody," and, accordingly, cannot support the wrongful removal claim.[8]

Nor has Petitioner demonstrated that he would have asserted custodial rights but for the removal. Although Petitioner immediately consulted with an attorney on being told that

---

[7] The facts here contrast sharply with those in <u>Whallon v. Lynn</u>, where court found that Whallon was actually exercising his rights of custody prior to removal. 230 F.3d 450, 459 (1st Cir. 2000). The court found that, although the parents separated within six months of his daughter's birth:

> the record reflects that Whallon was significantly involved in his daughter Micheli's life. From the time of Micheli's birth, Whallon saw her on an almost daily basis. And from the time Micheli was three years old, she spent every other weekend, overnights, with Whallon. Indeed, in August 1997, Whallon moved to within one hundred yards of where Lynn and Micheli lived to be closer to Micheli. Whallon also paid Lynn at least $500 of child support for Micheli each month, money that was used to pay for dental and medical work for Micheli. Whallon did the types of things that one generally expects an attentive and mindful parent to do: driving Micheli to and from nursery school every day for almost two years; buying Micheli clothes; helping her with homework and art projects; attending various school activities; and taking Micheli to the doctor when she was sick. Additionally, Whallon took Micheli—with Lynn's approval—to San Diego for medical and dental appointments and to Arizona in 1998 to meet Micheli's paternal grandfather.

<u>Id.</u> at 453.

[8] To the extent that Petitioner contends that Respondent has impaired his access rights, those claims are outside of the current petition. The court notes Petitioner continues to have visits with the child at least as frequently as he did in Armenia by way of video calls, which Respondent has reasonably facilitated, and that given the coronavirus pandemic, it is unclear if in-person visits would be occurring during the pandemic if Respondent and the child were in Armenia.

Respondent had traveled with the child to the United States, his actions were not consistent with interest in asserting a claim for actual custody (joint or otherwise). He rejected Respondent's suggestion that they file for divorce while Respondent was still in the United States and did not seek custody in Armenia until May 2020 when he finally filed a counterclaim to Respondent's suit for divorce. The roughly $40 a month child support that Petitioner was ordered to pay by the Armenian court hearing the divorce and custody proceedings remains in a court controlled fund; no financial support has been actually provided to Respondent for the care of the child. The mere fact that Petitioner has sought the return of the child under the Convention does not, in itself, establish any genuine interest in custody. The court notes that, on the same day Petitioner met with an attorney to initiate Convention proceedings, he threatened Respondent's mother that he would drag Respondent back to Armenia and punish her for daring to visit her brother.

In sum, the court finds that, at the time Respondent removed the child from Armenia, Petitioner was exercising "rights of access" and not "rights of custody." Petitioner had, in fact, explicitly disavowed any interest in the determination of the child's place of residence and rejected taking on meaningful responsibility for the child's daily care. As such, Respondent's removal of the child from Armenia for a tourist visit to the United States, though prolonged by the coronavirus pandemic, was not wrongful under the Convention.[9]

---

[9] The court further notes that, just as the removal of a child from her country of habitual residence may not be used as a weapon to affect the adjudication of child custody, a petition brought pursuant to the Convention should not be used as a weapon to affect the adjudication of a divorce. Proceedings here are not to be used as leverage in negotiations over child support or other domestic arrangements. Under the Convention, this court serves to protect the jurisdiction of the country of the child's habitual residence and, in this case, the ongoing custody proceedings in the appropriate Armenian tribunal.

2. Did Petitioner Have Legal Custody Under Armenian Law at the Time of the Child's Removal?

In light of the finding that the Petitioner was not actually exercising any rights of custody at the time of the child's removal, the court does not need to reach the question of whether Petitioner had legal custody of the child under Armenian law at the time of the child's removal.

B. Affirmative Defenses

Having found that the removal of the child from Armenia was not wrongful, the court also does not reach Respondent's affirmative defenses that Petitioner consented to her removal of the child from Armenia, Verified Answer 12-13 [#13], subsequently acquiesced to the removal, poses a grave risk of harm to the child should she be returned, or undertook this litigation with unclean hands. Verified Answer 23-26 [#13].

IV. Conclusion

For the foregoing reasons, Petitioner's Verified Petition [#1] is DENIED without prejudice to its renewal should there be a material change in fact.[10]

IT IS SO ORDERED.

Date: August 25, 2020

/s/ Indira Talwani
United States District Judge

---

[10] Petitioner's request for fees and costs are also denied. Respondent's request for fees and costs will be addressed in a separate order.